Bbinkeehoee, C.J.
At the October election of 1869, the parties to this case were rival candidates for the office of clerk of the court of common pleas of Montgomery county. The clerk of the court of common pleas of the county, with two justices of the peace, proceeding under the statute, within the time prescribed after the election, to make an abstract of the returns of the votes cast in the several election precincts of the county, declared that John F. Sinks was duly elected to the office — he having 6306 votes, while David W. Reese had 6283; showing a majority for Sinks of twenty-three.
Within the time prescribed by law in such cases, Reese filed in the office of said clerk notice in writing of his appeal from the finding and declaration of the clerk and justices, claiming that he had received a majority of the votes cast at said election for the office of clerk. He also in due time served upon Sinks notice in writing of his intention to contest said election, and of the time and place of taking depositions of witnesses, to be given in evidence on the trial of the contest in the court of common pleas.
. At the next term of that court following the election, the case was tried; and the court found that Reese had received a majority of the votes cast at the election for clerk — his majority, as so found by the court, being twenty-seven votes. To reverse this finding of the court of common pleas a petition in error is prosecuted in this court.
It is evident that the case was very zealously contested in the court of common pleas, eighteen bills of exception having been taken by counsel for plaintiff in error, during the progress of the trial, to the various rulings of the court.
We do not deem it worth while to notice, and much less to discuss, all the points thus made and presented by the record; *313 but, as we are of opinion that the court below did err in some of its rulings, to the prejudice of the plaintiff in error, we will content ourselves with a notice of those rulings only.
The leading question in the case arises on this state of facts, as appears from the record. Within the boundaries of one of the election precincts of Montgomery county is situated an institution known in law and in fact as -“ the national asylum for disabled volunteer soldiers.” At the time of the election in question there were a considerable number of disabled volunteer soldiers, late of the army of the United States, staying at, and maintained and provided for in that institution, some of whom were, and others of whom were not, at the time of their entrance therein, resident citizens of this State. Of these persons, thirty in number, who had been inmates of the asylum for more than one year preceding the election, were permitted to vote, and did vote for Sinks. Eight other inmates of the asylum similarly qualified or disqualified, were permitted to vote, and did vote for Reese. It appears from a bill of exceptions forming part of the record, that the court, in making up its finding of the number of votes cast for the parties respectively, rejected the former, and (through inadvertence and oversight, ás we have good reason to believe) allowed the latter; and this is assigned for error.
The question thus presented as to the legality or illegality of the votes of the inmates of the asylum, leads us necessarily to inquire, What is, in law, the character of this institution ? and, What is the legal status of its resident inmates %
And first, as to the character, in law, of the institution. It was established under and in conformity to the provisions of the act of the Congress of the United States of March 21, 1866, entitled “An act to amend an act entitled an act to incorporate a national military and naval asylum for the relief of the totally disabled officers and- men of the volunteer forces of the United States.”
The first three sections of the act provide for “ an establishment for the care and relief of the disabled volunteers of the United States army, to be known by the name and style *314 of the national asylum for disabled volunteer soldiers,” with a board of managers, consisting of the President of the United States, Secretary of War, Chief Justice of the United States, for the time- being, together with nine others_ no two of whom shall be residents of the same State, to be appointed by joint resolution of the two houses of Congress, to have perpetual succession, with power to take, hold, and convey real and personal property, establish a common seal, and to sue and be sued in courts of law and equity; and to make by-laws, rules, and regulations for carrying on the business and government of the asylum, and affix penalties thereto. The fourth section confers power on the board of managers to procure sites and to have necessary buildings erected thereon of sufficient capacity to accommodate the persons to 'be provided for. The fifth section appropriates various forfeited and unclaimed funds in the treasury of the United States to the support of the asylum, and authorizes the acceptance of donations for its benefit. The ninth section provides, “ that all inmates of the asylum shall be, and they are hereby, made subject to the rules and articles of war, and will be governed thereby, in the same manner as if they were in the army of the United States.” And the thirteenth and last section provides, “ that Congress may at any time hereafter alter, amend, or repeal this act.”
Here, then, is an institution invested with corporate powers, established by the government of the United States for its own purposes — the relief and support of its disabled volunteer soldiers. It is placed under the sole control and management of a board, constituted, appointed, and to be appointed perpetually by the government of the United States. It is to be maintained by funds from the treasury of the United States; and its inmates are subjected to and governed by the rules and articles of war of the United-States.
That Congress had the right, under the Constitution of the United States, and with the consent of the legislature of this State, to establish such an institution, we think there can be no reasonable question. By the eighth section of the first article of the constitution, it is provided, “That the *315 Congress shall have power ... to exercise exclusive legislation in all cases whatsoever . . . over all places purchased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings.” The power to declare war, and to raise and support armies, is vested in the Congress of the United States. These provisions anticipate the existence of a state of war. Disease and wounds, maiming and disabilities, are the natural and necessary consequences of war; and to leave men maimed and disabled while in the service of the government, unprovided for, would shock not only the sensibilities, but the sense of justice, of all civilized men. Asylums for the disabled soldier -in no substantial sense differ from hospitals in a fortress or in the field. All are alike necessary, and the power to erect and maintain them is incidental to the war power of the government.
The legislature of this State has consented to the establishment of this asylum. By the first section of the act of April 13, 1867 (64 O. L. 149), it is provided:
“ Section I. That jurisdiction of the lands and their appurtenances, which may be acquired by donation or purchased by the managers of the national asylum for disabled volunteer soldiers within the State of Ohio, for the uses and purposes of said asylum, be, and is hereby, ceded to the United States of America; provided, however, that all civil and criminal process issued under the authority of the State of Ohio, or any officer thereof, may be executed on said lands and in the buildings which may be located thereon, in the same way and manner as if jurisdiction had not been ceded as aforesaid; and provided, further, that nothing in this act shall be construed to prevent the officers, employes, and inmates of said asylum, who are qualified voters of this State, from exercising the right of suffrage, at all township, county, and State elections, in the township in which the said national asylum shall be located.”
The second section of the same act exempts all the property, real and personal, held by the board of managers for the uses and purposes of the asylum, from taxation and *316 assessment, “ «o long as the same shall remain the property of the United States, for the uses of the national asylum.”
This act of the State legislature, consenting to the establishment of the asylum within her borders, and ceding “ jurisdiction of the lands and .appurtenances ” of .the asylum to the United States, under the operation of the clauses of the eighth section of the first article of the Constitution of the United States above referred to, fixes the exclusive jurisdiction of the general government over this institution, its lands and its inmates, “ in all cases whatsoever,” except as to the execution of process issuing under State authority.
2. This leads us to consider what is the legal status of persons who become residents upon the grounds, and within the limits of the institution thus within the exclusive jurisdiction of the United States; and how does it affect their claim to exercise the elective franchise íd Ohio, under its constitution and laws ? In passing on these questions, there is little need of speculative reasoning ; for they have been in effect settled by repeated decisions of courts of high and conclusive authority. By becoming a resident inmate of the asylum, a person though up to that time he may have been a citizen and resident of Ohio, ceases to be such; he is relieved from any obligation to contribute to her revenues, and is subject to none of the burdens which she imposes upon her citizens. He becomes subject to the exclusive jurisdiction of another power, as foreign to Ohio as is the State of Indiana or Kentucky, or the District of Columbia. The constitution of Ohio requires that electors shall be residents of the State; but under the provisions of the Constitution of the United States, and by the consent and act of cession of the legislature of this State, the grounds and buildings of this asylum have been detached and set off from the State of Ohio, and ceded to another government, and placed under its exclusive jurisdiction for an indefinite period. We are unanimously of the opinion that such is the law, and with it we have no quarrel; for there is something in itself unreasonable that men should be permitted to participate in the government of a community, and in the imposition of charges upon it, in whose inter *317 ests they have no stake, and from whose burdens and obliga 'tions they are exempt. In 1811, the case of Commonwealth v. Clary was decided by the supreme court of Massachusetts. 8 Mass. 72. It was an indictment under the laws and in a court of the State for selling spirituous liquor without license, within grounds purchased by the United States within the town of Springfield with the consent of the legislature of the State, and for the purposes of an arsenal. In the legislative act of consent, a reservation as to the service of State process was made similar to that contained in the Ohio act of consent and cession heretofore referred to. It was held, “ that the territory on which the offence charged is agreed to have been committed is the territory of the United States, over which the Congress have the exclusive power of legislation. The assent of the commonwealth to the purchase of this territory by the United States had this condition annexed to it: that civil and criminal process might be served therein by the officers of the commonwealth. This condition was made with a view to prevent the territory from becoming a sanctuary for debtors and criminals; and from the subsequent assent of the United Spates to the said condition, evidenced by their making the purchase, it results that the officers of the commonwealth, in executing such process, act under the authority of the United States. No offences committed within that territory are committed against the laws of this commonwealth ,• nor can such offences be punishable by the courts of the commonwealth, unless the Congress of the United States should give to the said courts jurisdiction thereof.
“As a consequence of these positions, it is the opinion of the court that they have no cognizance of the offences charged in this indictment, and that the defendant must be discharged.
“An objection occurred to the minds of some members of the court, that if the laws of the commonwealth have no force within this territory, the inhabitants thereof cannot exercise any civil or political privileges, under the laws of Massachusetts, within the town of Springfield. We ara *318 agreed that such consequence necessarily follows; and we think that no hardship is thereby imposed on those inhabitants: — because they are not interested in any elections made within the State, nor held to pay any taxes imposed by its authority, nor bound by any of its laws. And it might be very inconvenient to the Hnited States to' have their laborers, artificers, officers, and other persons employed in their service, subjected to the services required by the commonwealth of the inhabitants of the several towns.
“ It will be noticed that in this decisión we make a distinction between persons who actually dwell within the territory owned by the Hnited States, and the laborers and artificers employed therein, who have their dwelling elsewhere.”
Story, in his Commentaries on the Constitution, treating of this subject, sec. 1227, says “that the States cannot take cognizance of any acts done in the ceded places after the cession; and, on the other hand, the inhabitants of those places cease to be inhabitants of the State, and can no 'longer exercise any civil or political rights under the laws of the State.” Rut it is needless to multiply quotations. Suffice it to say, that to the same ^general effect is the opinion of Chancellor Kent. 1 Com., marginal paging 429, 430, 431; and United States v. Davis, 5 Mason's R. 356; Same v. Cornell, 2 Mason's R. 60; 1 Metcalf, 580; Mitchell v. Tibbetts, 17 Pick. 298.
As for the concluding proviso of the first section of the Ohio act of cession, hereinbefore quoted, and the provision substituted .therefor in the first section of 'the act amendatory thereof (65 O. L. 208), it is unnecessary for us to consider and determine their proper construction and meaning, for the reason that it is not constitutionally competent for the general assembly to confer the elective franchise upon persons whose legal status is fixed as non-residents of the State.
We are of opinion, therefore, that the court below did not err in rejecting as illegal the votes cast by resident inmates of the national asylum for Sinks, and that it did err in refusing to reject as illegal the eight votes of Adams, *319 Combs, Banlcbead, Ott, Eorde, Gray, Lewerdy, and Walking, resident inmates of said asylum, cast for Eeese.
The next point on which we are of opinion that the court below erred in its ruling arises in this way: the .contestar offered in evidence at the trial the depositions of hiipself and of sundry other witnesses, to the effect that he and they, after the. election, had examined the poll-book and tally-sheet made and kept at the election in the sixth ward of the city of Dayton, and had counted the ballots cast at the election in that ward, and that they had found an error in the count and return of the votes in that ward, of fifteen in favor of Sinks and against Eeese. Neither poll-book, tally-sheet, nor ballots were attached to or accompanied the depositions, nor was there any evidence given or offered to show any reason why these were not, or could not be, produced. The plaintiff in error objected to the competency of the depositions as evidence, on the ground that the evidence offered was secondary in its nature, and not the primary and oest evidence of which the case admitted. The court overruled the objection and admitted the depositions in evidence, and the plaintiff in error excepted.
We are unable to find any good reason why the general rule, that the best evidence of which the case in its nature is susceptible Ought to be adduced unless good cause is shown why it is not done, should have been departed from in this case. The depositions admitted in evidence show that the poll-book, tally-sheet, and ballots of the sixth ward were readily accessible, and might have been attached to a deposition, and exhibited to the court. The official return of the votes cast in the ward was made by three judges of the election under their official oaths. Then come the depositions of the contestar himself, and three other witnesses selected by himself, testifying to a mistake of fifteen made in the count. The case illustrates the wisdom of the rule. It would have been far more satisfactory to have had the tally-sheet, poll-book, and ballots themselves to speak for themselves both as to number and contents; and the inspection of these papers by the court itself would, we think, involve no such degree of *320 inconvenience as to justify a relaxation of the rule. The application of this rule to the sixth ward, and other election precincts in respect to which the same question was made, and the error of the court below in counting eight votes cast for Reese by inmates of the asylum, disposes of a sufficient number of votes for Reese to change the result arrived at by that court, and compels a reversal of its finding.
We are furthermore of the opinion that the court below erred in counting for the contestor the vote of one Wortz, whom the testimony clearly shows, we think, to be an idiot; and also in refusing to count the vote of an old gentleman of the name of Davidson, who is not shown by the evidence to be either a lunatic or an idiot, but simply a man whose mind is greatly enfeebled by age. This is not a legal disqualification ; and the reverence which is due to “ the hoary head ” ought to have left his vote uncontested.
As to many other points made by the plaintiff in error, and not herein above referred to, we content ourselves wdth saying that we find no substantial error prejudicial to the plaintiff in error in the rulings of the court below.
Finding of the court of common pleas reversed, and case remanded for new trial.
Scott, Welch, White, and Day, JJ., concurred.